No. 03-1657
File Name: 04a0094n.06
Filed: November 17, 2004

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| WILLIAM PEYTON, | ) |
| | ) |
|   Plaintiff-Appellant, | ) |
| | ) ON APPEAL FROM THE |
|     v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| KELLERMEYER COMPANY, | ) DISTRICT OF MICHIGAN |
| | ) |
|   Defendant-Appellee. | ) |

Before: **NELSON**, **SILER**, and **BATCHELDER**, Circuit Judges.

**DAVID A. NELSON**, Circuit Judge. This is an age discrimination case. The district court entered summary judgment for the defendant after concluding that the plaintiff had failed to present either direct or circumstantial evidence sufficient to support a verdict in his favor. Although the question is a close one, we conclude that there was enough evidence to justify a jury in finding that the defendant discharged the plaintiff because of his age. We shall therefore reverse the judgment entered by the district court and remand the case for further proceedings.

I

The defendant, Kellermeyer Company, hired the plaintiff, salesperson William Peyton, after buying the assets of Peyton's previous employer, Fisher Brothers, in January of 1996. Mr. Peyton, who was 62 years old at the time, continued selling paper products, packaging, and chemicals for Kellermeyer as he had done for Fisher Brothers. He worked out of an office in Jackson, Michigan, along with three other sales personnel and a support staff of four.

Kellermeyer Company closed its Jackson sales office in the spring of 1998 because, in the words of Kellermeyer's president, the Jackson area "was not an area of growth or successful market penetration." The office was consolidated with one in Fort Wayne, Indiana. Only two salespersons, Mr. Peyton and Steven Jamieson, were working the Jackson territory at that time, and in March of 1999 Mr. Jamieson left the company. Peyton inherited several large accounts from Jamieson.

In March of 1998, around the time that the Jackson office was being closed, Mr. Peyton and his sales manager, James Littlejohn, had a conversation about retirement. According to Mr. Peyton, Littlejohn called him and said that Tom Kellermeyer, one of two brothers who owned the company, wanted Peyton to retire by January 1, 1999. Peyton asked why, and Littlejohn said that "they wanted younger people on the sales force and that [Peyton] was getting too old."

Mr. Littlejohn denies making these statements. According to Littlejohn, Tom Kellermeyer merely asked him to find out whether Peyton wanted to retire. Mr. Kellermeyer

testified that he had understood from Littlejohn that Peyton was interested in retirement, which prompted Kellermeyer to tell Littlejohn to doublecheck this understanding.

Mr. Littlejohn says that he did not discuss retirement with Mr. Peyton after the initial conversation on the subject, and Peyton acknowledges that the matter was not broached again for about a year. Then in March of 1999, according to Peyton, Littlejohn called to ask if Peyton had made any plans to retire. When Peyton said that he had not, Littlejohn told him that "Tom Kellermeyer says you can stay and work with the company as long as you wish." Mr. Kellermeyer testified he had heard that Peyton "thought [Mr. Kellermeyer] wanted him to retire" and Kellermeyer had therefore instructed Littlejohn to "tell Bill that he doesn't have to retire."

Kellermeyer Company was experiencing financial difficulties in 1998 and 1999. For the fiscal year ending September 30, 1998, the firm suffered a net loss of over $800,000. In fiscal year 1999, although Kellermeyer reduced its selling and administrative expenses by about $1.1 million, the company still lost almost $150,000. These reversals resulted in a breach of Kellermeyer's loan covenants, and the lenders demanded that the company improve its performance.

Against this background Kellermeyer decided that a reorganization of its sales force was necessary. The reorganization plan entailed a reassignment of salespersons "by trade classification, not by geography," with a transfer of non-selling duties from salespersons to

inventory specialists and customer service representatives. The plan also called for a reduction in the number of salespersons.

A team headed by senior vice president of sales and marketing Stanley McCormick and assisted by Tom Kellermeyer, industrial bulk division manager Greg Kaser, and James Littlejohn reviewed the sales force to identify likely candidates for discharge. The team took several measures of performance into account, including each salesperson's gross profits growth, sales growth, account maintenance, new account growth, and increase in gross profits per order. The team also considered whether the geographic areas in which the salespersons worked were likely to support future growth. The latter consideration was particularly relevant to Mr. Peyton's situation because, as was reflected in Kellermeyer's closing of its Jackson office, the company had concluded that the Jackson area would not be a focus of its business plans. According to Mr. McCormick there were not enough large accounts in that area and there was increased competition for the large accounts that did exist.

In January of 2000 McCormick recommended to Kellermeyer's senior management committee that four salespersons, including Mr. Peyton, be let go. The ages of these individuals ranged from 52 to 66, with Mr. Peyton being the oldest.

After considering the recommendation, Tom Kellermeyer and his brother Don decided that the 52-year-old salesperson should be retained and a 44-year-old should be discharged in his place. The decision was based on geography, seniority, and the quality of some of the

52-year-old's accounts. This change aside, the McCormick team's recommendations were accepted.

Littlejohn informed Peyton on January 26, 2000, that his employment was being terminated. According to Peyton, Littlejohn told him that "the company was going to a specialist type of selling" and Peyton "wouldn't be a part of it." In February, however, McCormick offered Peyton an opportunity to continue servicing his four or five largest accounts on a part-time basis. Peyton declined the offer, choosing instead to accept a "Compensation Plan and Agreement" under which he received two months' pay in exchange for assistance in the "transition" of his accounts to other sales representatives. Mr. Peyton's duties were assumed by three of Kellermeyer's existing salespersons.

Relying on Michigan law, Mr. Peyton sued Kellermeyer Company in federal district court on a claim of age discrimination. Kellermeyer moved for summary judgment after the completion of discovery.

The district court granted the motion. The court held that the age-related statements which Peyton attributed to Littlejohn did not qualify as "direct evidence" requiring summary judgment to be withheld; that Peyton had not presented sufficient circumstantial evidence of age-based discrimination; and that Peyton had not rebutted Kellermeyer's performance-related reasons for selecting him for discharge. This appeal followed.

II

Although it was brought under Michigan law, Mr. Peyton's claim may be analyzed in the same manner as a claim brought under the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* See *Plieth v. St. Raymond Church*, 534 N.W.2d 164, 167 (Mich. App. 1995), *appeal denied*, 549 N.W.2d 564 (Mich. 1996). An employee may establish such a claim on the basis of either direct or circumstantial evidence of age discrimination. *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). A determination that a plaintiff has failed to offer sufficient evidence of either variety is reviewed de novo. See *id.* at 569-70.

A

"Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Furniture* at 570 (internal quotation marks omitted).[1] Mr. Peyton

---

[1]The dividing line between "direct" and "circumstantial" evidence is murky at best. "Direct evidence," for what it may be worth, has often been defined as evidence which, if believed, suffices to prove a fact at issue "without inference or presumption." See Black's Law Dictionary 460 (6th ed. 1990), citing *State v. McClure*, Mo. App., 504 S.W.2d 664, 668. Some courts have developed variants of this definition in employment discrimination cases, where presentation of "direct evidence" of unlawful discrimination was at one time considered a prerequisite to the giving of a "mixed-motive" jury instruction under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). See *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572, 580, 581-82 (1st Cir. 1999), *abrogated*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). In this context, direct evidence has sometimes been defined as evidence of statements or actions that (1) reflect an unlawful discriminatory animus and (2) relate "directly" to the contested employment decision. See *id.* (citing cases). The Supreme Court has now made it clear that "direct evidence" is not essential to prove a mixed-motive

points to his testimony concerning comments made by Mr. Littlejohn in March of 1998 –

comments to the effect that Tom Kellermeyer wanted Peyton to retire because he was

"getting too old" – as direct evidence of illegal age discrimination.[2] In our view, a reasonable

trier of fact could believe this testimony and still conclude that Peyton's discharge was

lawful; accordingly, the testimony does not meet the Sixth Circuit's "direct evidence" test.

Littlejohn's comments were made almost two years before Mr. Peyton was fired and

about one year before Kellermeyer Company undertook to reduce its sales force.  During the

two years that elapsed between the comments and the firing, Littlejohn is claimed to have

raised the topic of retirement only once with Peyton, and on that occasion — according to

Peyton's own testimony —  Littlejohn assured Peyton that he could work for Kellermeyer

Company as long as he liked.  In these circumstances – where the March 1998 comments

were "isolated," were made outside of "the decision-making process" by which

---

employment discrimination case, see *Desert Palace*, 539 U.S. at 101-02, but the various employment-oriented definitions of direct evidence — including that used in *Wexler v. White's Furniture* —  have lingered on.

[2]  Kellermeyer Company argues that Peyton's testimony about what Littlejohn said Tom Kellermeyer told him constitutes double hearsay, which may not be considered for purposes of summary judgment. See *Weigel v. Baptist Hospital of East Tennessee*, 302 F.3d 367, 378 (6th Cir. 2002).  We disagree.  Under Rule 801(d)(2) of the Federal Rules of Evidence a statement is not hearsay if it is offered against a party and is the party's own statement or "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Given that Mr. Kellermeyer was a principal of the company and that Mr. Littlejohn was a company employee and Mr. Peyton's supervisor, we think that the statements in question fall within the ambit of this rule.

Kellermeyer's sales force was reduced, and were not "proximate in time to the act of termination" – we do not think that Mr. Peyton's testimony, if believed, requires a finding that discriminatory animus motivated his discharge. See *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994), and *Das v. The Ohio State University*, 57 Fed. Appx. 675, 678-79 (6th Cir. 2003) ("Merely vague, ambiguous, or isolated remarks by a company agent which were not related to the decision-making process and were not made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of outlawed employment discrimination . . . ." (internal quotation marks and brackets omitted)).

Mr. Peyton also points to evidence that there was discussion among the members of the McCormick team about whether Peyton was someone who might have difficulty adjusting to new demands. Again we are not persuaded that this evidence, if believed, compels a finding of illegal age discrimination. There are persons of every age who have difficulty adjusting to new demands, and we have no reason to suppose that anyone at Kellermeyer assumed Peyton was such a person on account of his age. In our view, a reasonable trier of fact would not be required to conclude that the discussion in question reflected stereotypical notions about older workers rather than an honest assessment of Peyton's abilities.

B

The burden-shifting framework outlined by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), guides our analysis of age discrimination claims that are based on circumstantial evidence. See *Wexler*, 317 F.3d at 574. The plaintiff must first establish a prima facie case by presenting facts that raise an inference of unlawful discrimination. The defendant may rebut that inference by offering a legitimate, non-discriminatory reason for the challenged action. If the defendant does so, the plaintiff must demonstrate that the stated reason is really a pretext for illegal age discrimination. See *id.*

A plaintiff can ordinarily establish a prima facie case of age discrimination by showing (1) that he is at least 40 years old, (2) that he was discharged, (3) that he was qualified for his position, and (4) that he was replaced by a younger person. *Skalka v. Fernald Environmental Restoration Management Corp.*, 178 F.3d 414, 420 (6th Cir. 1999), *cert. denied*, 530 U.S. 1242 (2000). Where the discharge occurred in the context of a reduction in force, however, "the fourth requirement is modified to require the plaintiff to offer some direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* (internal quotation marks omitted).

Only the fourth element of Mr. Peyton's prima facie case is at issue here. With respect to that element, it seems to us that on balance the evidence presented by Mr. Peyton would permit a reasonable jury to find that he was selected for discharge because of his age.

Although it did not qualify as "direct evidence" of illegal discrimination, Mr. Littlejohn's alleged statement that the company "wanted younger people on the sales force and that [Peyton] was getting too old" could suggest to a reasonable trier of fact that Peyton's age was a factor in the minds of at least two members of the review team — Littlejohn and Tom Kellermeyer, on whose behalf Littlejohn was said to have been speaking.[3] Littlejohn's subsequent assurance that Peyton could "stay and work with the company as long as [he] wish[ed]" would not have to be accepted by a jury at face value, in our view.

A reasonable jury could find it significant that each of the four salespersons Mr. McCormick recommended for discharge was more than 50 years of age, and that each of three new salespersons hired later in the same year was under 50. These facts certainly do not compel the conclusion that Kellermeyer was motivated by age when it selected the salespersons to be discharged, and the record reflects that Kellermeyer retained six salespersons over the age of 50 (one of whom was over 60) when it discharged Mr. Peyton in 2000. Out of six salespersons hired by Kellermeyer the following year, moreover, three were over 50. Still, it seems to us that in light of the entire record, including Littlejohn's

---

[3] Obviously, of course, a jury could believe Mr. Littlejohn's testimony that he did not make any such remark. If the jury were to accept Mr. Littlejohn's statement that he merely asked whether Peyton wanted to retire, we do not think any age-related bias could reasonably be inferred. The conversation occurred when Kellermeyer was closing the Jackson office and Mr. Peyton was in his mid-60s. It would have been perfectly reasonable, in our view, for the company to inquire about any retirement plans before reassigning Peyton to another office.

retirement-related statements, this evidence might "tend[] to indicate" to a reasonable fact-finder that Kellermeyer singled out Peyton because of his age. *Skalka*, 178 F.3d at 420.

Kellermeyer Company responded to Mr. Peyton's prima facie case of age discrimination by offering legitimate, non-discriminatory reasons for selecting him for discharge. Specifically, Kellermeyer presented evidence that Peyton was underperforming in the areas of sales growth and new account growth. Mr. Peyton has not disputed the accuracy of this evidence — evidence which shows, for example, that sales to Peyton's accounts went down by approximately $90,000 in the first 11 months of fiscal year 1999 and dropped another $97,000 over the first quarter of fiscal year 2000.

Mr. Peyton has presented evidence, however, from which a jury could conclude that poor performance did not actually motivate his discharge. For one thing, Peyton testified that the additional accounts he inherited when Jamieson left the company in early 1999 caused him to be "spread so thin" that he could not give sufficient attention to his existing accounts, let alone generate new accounts. Mr. Littlejohn confirmed that "[t]here were just too many accounts for one person to grow that business"; Peyton, according to Littlejohn, "didn't have enough time to bring in new accounts."

In addition, there is undisputed evidence that Mr. Peyton was a top performer in terms of gross profits — the measure that Mr. Littlejohn "looked at the most" when reviewing his sales staff's performance. During fiscal year 1999, only one salesperson in Kellermeyer's Fort Wayne sales office was credited with higher gross profits than Mr. Peyton. And in fiscal

year 2000 only two salespersons were generating more gross profits than Mr. Peyton at the time he was let go.  There is thus evidence that Peyton was a leading producer of profits for the company despite the declining sales in the Jackson territory and his inability to bring in new accounts.

Moreover, neither Littlejohn nor McCormick mentioned poor performance when explaining to Peyton why he was being fired.  To the contrary, Peyton testified that Littlejohn told him merely that he "wouldn't be a part" of the company's new "trade class" selling system.

In these circumstances, we think it should be left to a jury to decide whether poor performance was the real reason for Mr. Peyton's inclusion in the group whose jobs were terminated.  See *Wexler*, 317 F.3d at 576-77, where we held that the question of pretext must be submitted to a jury if there is evidence that the defendant knew that the reasons for the plaintiff's poor performance were beyond the plaintiff's control.

The judgment entered by the district court is **REVERSED**, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.