NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0708n.06
Filed: October 3, 2007

No. 06-4234

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RONALD D. SKELTON, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| SARA LEE CORPORATION, | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | |
| | ) | |

## OPINION

**Before: BATCHELDER, GRIFFIN, Circuit Judges; ACKERMAN, District Judge.**[*]

**HAROLD A. ACKERMAN, District Judge.**

After Sara Lee Corporation discharged Ronald Skelton in a reduction in force, Skelton alleged age discrimination in violation of Ohio and federal law. Skelton appeals from the District Court's grant of summary judgment in favor of Sara Lee Corporation. Because Skelton has not satisfied the third stage of the *McDonnell Douglas* burden-shifting framework, we **AFFIRM**.

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

1

## I.

Plaintiff-Appellant Ronald D. Skelton began working for Defendant-Appellee Sara Lee Corporation in 1979. In January 1985, Skelton became a load planner (hereinafter "Planner") within Defendant's Transportation Department, a position he held until the effective termination of his position on February 28, 2003. At the time of the termination of his position, Skelton was 46 years old. He now appeals the District Court's grant of summary judgment in favor of Defendant on his claims for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*., and Ohio's age discrimination statute, Ohio Revised Code Chapter 4112.

Defendant manufactures and markets numerous brand-name food products, such as Hillshire Farms, Sara Lee, Jimmy Dean, and Ballpark. Defendant's Transportation Department is responsible for distributing products from the several production facilities where products are made to a handful of regional warehousing and distribution facilities, or "mixing centers." From these mixing centers, combinations of products are loaded onto trucks for shipments to customers. As a Planner, Skelton was primarily responsible for "building loads," i.e., selecting the carrier for each shipment and the most efficient arrangement of orders on the trucks to ensure the lowest possible costs to customers. Planners are responsible for dealing with frequent carrier problems, miscommunications, and other complications.

Prior to 2000, Defendant did not operate centralized mixing centers. Defendant's nine primary brands operated as independent companies, each with its own Planners located at the various production facilities who managed the transportation of products directly from the

production facilities to the customers. In an apparent effort to improve efficiency and increase customer satisfaction, Defendant made drastic changes to its business model in the beginning of 2000, including the creation of five regional mixing centers. During this reorganization, Defendant also centralized all of its Planners by moving them to the Spring Grove, Ohio, facility. From Spring Grove, Planners would remotely manage the transportation of products from the five regional mixing centers to grocery stores. As a result of the reorganization, the Planner positions that existed at Defendant's production facilities were eliminated, and many Planners were laid off. Defendant also hired several new Planners during the first half of 2002 to operate the newly centralized Spring Grove facility. Skelton was not laid off at this time because he had already been working as a Planner in Spring Grove. Thus, Skelton began working in the new, centralized, Transportation Department.

Defendant soon learned that the centralization of its transportation functions was not successful. Apparently, Planners had greater difficulty dealing with day-to-day transportation problems by phone or email from Spring Grove, as compared with operating on-site. Thus, in the Fall of 2002, Defendant decided to decentralize load planning by relocating the Planners to the five mixing centers. At that time, Defendant employed seventeen Planners at the Spring Grove facility; thus, several positions needed to be eliminated at the Spring Grove facility.

In early October 2002, Larry Rogers, Vice President of Transportation, discussed the plan to decentralize the load planning function with Phil Lower, Russ Gibson and Joyce Humphrey. Lower, a consultant hired to address problems in the department, had worked directly with several of the Planners in Spring Grove in the preceding months. Gibson and Humphrey were managers who directly supervised the Planners, including Skelton. On October 7, 2002, Rogers

3

and Monica Mehta, Defendant's Human Resource Manger, met with the entire department, including the Planners, to inform them of the decision to decentralize. Rogers explained that several Planner positions would be eliminated in Spring Grove and new Planners would be hired in the regional mixing centers. Rogers announced that the Planners would be required to interview for the positions that would remain in Spring Grove and that those Planners who were not retained could apply for the positions being created at the mixing centers.

The following week, Rogers and Humphrey interviewed every Planner, including Skelton. Rogers, Humphrey, and Lowers met after the interviews to discuss their initial impressions. Apparently, Gibson elected not to participate actively in the Planner selection process because he had previously been informed that his own position was going to be eliminated. Nevertheless, Gibson did provide to Humphrey *some* input on the Planners, which apparently was considered in the final analysis. When Rogers, Humphrey, and Lowers met again, they created a forced ranking of the Planners. Allegedly, the stated goal of the ranking was to identify the Planners willing to: (1) devote the greatest amount of time and effort to their jobs; (2) go beyond their regular duties; and (3) work hours in excess of their regular workday. With these criteria in mind, the seventeen Planners were ranked: Skelton ranked eleventh and was selected for termination. On October 18, 2002, Skelton was informed that he would be terminated from his position effective February 28, 2003.

On April 16, 2003, Skelton filed his Complaint, asserting claims for age discrimination in violation of the ADEA and O.R.C. §§ 4112.02 and 4112.99.[1] The District Court granted

---

[1] In the District Court, Skelton also asserted a claim for violation of Ohio public policy. Skelton, however, does not raise this issue on appeal.

4

summary judgment on July 31, 2006, in favor of Defendant on all of Skelton's claims. (J.A. at 117, Dist. Ct. Op. at 12; *see also Skelton v. Sara Lee Corp.*, No. 03-276, 2006 WL 2165710, at *6 (S.D. Ohio, July 31, 2006).) Skelton timely filed his Notice of Appeal with this Court on August 24, 2006.[2]

## II.

### A.      Standard of Review

This Court reviews *de novo* the District Court's grant of summary judgment. *Briscoe v. Fine*, 444 F.3d 478, 485 (6th Cir. 2006). A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When faced with a summary judgment motion, a district court must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 903 (6th Cir. 2006). The critical inquiry for a district court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### B.      Evidence of Age Discrimination

---

[2] The District Court had subject matter jurisdiction over Skelton's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Skelton's state claims under 28 U.S.C. § 1367. This Court has appellate jurisdiction to review the District Court's final order pursuant to 28 U.S.C. § 1291.

Under the ADEA, employers are prohibited from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000) (noting that a "plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome") (citation and quotation marks omitted). An employee may establish a claim under the ADEA by offering either direct or circumstantial evidence of age discrimination. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). Direct evidence of age discrimination is "that evidence, [which] if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)); *Rallins v. Ohio State Univ.*, 191 F. Supp. 2d 920, 928 (S.D. Ohio 2002) ("Direct evidence exists only where the unlawful discrimination is patent; it requires no inference of discrimination."). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler*, 317 F.3d at 570 (citation omitted).

### 1. Direct Evidence

At the outset, we consider whether Skelton offered any direct evidence of age discrimination. *See id.*; *see also Peyton v. Kellermeyer Co.*, 115 F. App'x 825, 829 n.1 (6th Cir. 2004) ("The dividing line between 'direct' and 'circumstantial' evidence is murky at best. 'Direct evidence' . . . has often been defined as evidence which, if believed, suffices to prove a fact at issue 'without inference or presumption.'") (citations omitted). Where a plaintiff

"succeeds in presenting direct evidence of a discriminatory motive, the burden [of production and persuasion] shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) (citation and quotation marks omitted).

Skelton's only purported direct evidence of age discrimination is that he "was repeatedly subjected to comments by his supervisor Russ Gibson to the effect that 'Ron [Skelton] has been around since Christ was a baby.'" (Pl.'s Br. at 13.) Defendant counters that there exists no evidence that Gibson made any such comment on more than one occasion. Indeed, the District Court suggested that Gibson made this statement on a single occasion sometime in 2002, and concluded that this statement did not qualify as direct evidence of age discrimination in accordance with this Court's precedent. Specifically, the District Court noted that "a reasonable trier of fact *could* believe Mr. Gibson made this statement and still conclude Defendant's termination of Plaintiff's employment was lawful." (J.A. at 112, Dist. Ct. Op. at 7 (emphasis added) (citing *Peyton*, 115 F. App'x at 829 ("In our view, a reasonable trier of fact could believe this testimony and still conclude that [the employee's] discharge was lawful; accordingly, the testimony does not meet the Sixth Circuit's 'direct evidence' test.")).)

Taking all inferences in the light most favorable to Skelton, we assume for the purposes of this appeal that Gibson made this comment and that he did so on multiple occasions. This Court has previously stated that statements allegedly showing an employer's age bias are to be evaluated by considering four factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the

7

statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002) (noting that "none of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account") (citation omitted). Skelton fails to assert that Gibson's statement satisfies any of these four factors. In fact, Skelton fails to address these factors at all. Nevertheless, even a brief examination of Gibson's statement in relation to these factors reveals that the District Court did not err in dismissing Skelton's alleged direct evidence of age discrimination.

Although he was a supervisor of the Planners, including Skelton, Gibson's influence in determining which Planners to terminate was limited. Prior to the Planners' interviews, Gibson himself was notified that his position would be eliminated. Thus, Gibson refused to be involved directly in the process of selecting which Planners were to be fired. Apparently, Gibson did provide some input to Humphrey, and Defendant acknowledges that this information was considered in the final analysis. Importantly, however, Gibson was not involved directly in the forced ranking of the Planners, a ranking which proved to be dispositive in determining which Planners would be let go.[3] Therefore, although Gibson, as a general matter, may have been a

---

[3] In his deposition testimony, Gibson commented that he refused to play any kind of role in connection with deciding the fate of the other employees. "I told them that [Defendant's] letting me go and then making me choose who would stay and who would go would stick like sour grapes, I would have no part in it." (J.A. at 122) Asked whether he provided "any input whatsoever," Gibson responded that he had communicated verbally with Humphrey regarding his opinion of the Planners, "who were the go-getters, who weren't, who would take on extra responsibilities . . . when needed, who wouldn't." (*Id.* at 122-23.) Gibson testified that he refused to participate in any of the group meetings. (*Id.* at 123.) With regard to Skelton, Gibson testified that "Ron does his job but he doesn't do extra. . . . he never volunteered to go the extra

8

"decision-maker" in his position as a supervisor for Defendant, Skelton presents absolutely no evidence to suggest that Gibson was a decision-maker with regard to the decision to terminate Skelton's position.

Likewise, there is no evidence that Gibson's statement was in any way *related* to Defendant's decision-making process in terminating Skelton. In fact, according to Defendant, Skelton himself acknowledged that he understood Gibson's comment "to refer to his tenure in the department rather than reflecting any age bias." (Def.'s Br. at 36; *see also* J.A. at 222 ("I would say it was more based on [my] length of service.").) Skelton does not contest this assertion. Indeed Gibson's comment is not discriminatory on its face. Perhaps, as Skelton asserts, the comment suggested that his age "was an issue." (Pl.'s Br. at 13.) However, an inferential step is necessary to equate Gibson's comment about Skelton's tenure with the department--or his age--with unlawful discriminatory animus. Even Skelton does not proffer such an argument. It is therefore reasonable to conclude that Gibson's statement was an isolated and irrelevant remark that had no influence on the termination decision. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) ("[I]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.") (citation and quotation marks omitted).

Finally, the District Court indicated that Gibson made this comment sometime in 2002. The decision to terminate Skelton was made on or about October 18, 2002. Thus, although the comment and the decision to eliminate Skelton's position occurred in the same calendar year, it is unclear whether Gibson's comment was made "proximate in time" to Defendant's decision to

leg up like [some] others." (*Id.* at 124.)

9

terminate Skelton. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 600 (6th Cir. 2006) (Griffin, J., dissenting) (noting that according to earlier precedents of this Court "temporal proximity alone cannot establish the requisite causal nexus between the employee's protected activity or status and the adverse action."). Notably, however, Skelton fails even to assert evidence that there was any temporal proximity.

Because none of the four factors, as articulated in *Peters*, weigh in Skelton's favor with regard to Gibson's comments, this Court affirms the District Court's conclusion that Skelton failed to proffer any direct evidence of age discrimination.

### 2.        Circumstantial Evidence

This Court is guided by the *McDonnell Douglas* burden-shifting framework to analyze age discrimination claims based upon circumstantial evidence. *Wexler*, 317 F.3d at 574 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, an employee must establish a prima facie case of age discrimination. *Id.* Once an employee satisfies this burden, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998). If the employer is able to do so, the burden shifts back to the employee to rebut the employer's proffered reason by showing by a preponderance of the evidence that the employer's articulated reason was a pretext for intentional age discrimination. *Id.* Importantly, the burden of persuasion remains on the employee. *Reeves*, 530 U.S. at 143. However, the employer's alleged nondiscriminatory reason for taking an adverse employment action may not be considered by a court when analyzing the prima facie case. *Wexler*, 317 F.3d at 574 ("To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the

10

nondiscriminatory reason was in actuality a pretext designed to mask discrimination.").

### a.     Prima Facie Case

Pursuant to the *McDonnell Douglas* formula, to establish a prima facie case of age discrimination, an employee must show the following elements: (1) he was a member of the protected class (i.e., age 40 or over); (2) he was qualified to perform the job; (3) he was subject to an adverse employment action; and (4) he was replaced by a younger individual.  *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998); *see also Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 588 (6th Cir. 2002) (noting that "[a] presumption of discrimination arises when a plaintiff establishes a prima facie case under the first stage of the *McDonnell Douglas* test").  However, as the District Court recognized, where an employee's position is eliminated pursuant to a reduction in force ("RIF") or reorganization, the analysis with regard to the fourth element differs because the employee is not replaced.  (J.A. at 112, Dist. Ct. Op. at 7 (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999)); *see also Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464-65 (6th Cir. 1990).)  By showing only the first three elements of the *McDonnell Douglas* formula, an employee "has not presented any evidence indicating that the work force reductions are not the reasons for the discharge."  *Barnes*, 896 F.2d at 1465 (noting that in RIF cases "'the most common legitimate reasons' for the discharge are the work force reductions" themselves); *see also id*. ("A different result would allow every person age 40-and-over to establish a prima facie case of age discrimination if he or she was discharged as part of a work force reduction.").  Thus, in a RIF or reorganization case, the employee "does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible

11

reasons." *Id.* (hereinafter "the fourth element" or "the *Barnes* additional evidence requirement");

*see also Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006) ("The purpose of the additional evidence requirement is to ensure, in [RIF] cases, that the plaintiff has presented evidence to show that there is a chance that the reduction in force is not the reason for the termination.");

*Ercegovich*, 154 F.3d at 350 (citing *Barnes*).

The parties agree that Skelton satisfies the first three elements of the prima facie showing. (*See* Def.'s Summ. J. Br. at 8, J.A. at 29 ("To be clear, Sara Lee's management never believed that Skelton was a bad planner, or that he lacked the skills and knowledge to do the job.").) Skelton, however, argues that the District Court improperly determined that he failed to satisfy the fourth element of the prima facie showing. For the purpose of this appeal, we assume, without deciding, that Skelton indeed established the fourth element of the prima facie showing, and thus satisfied the first prong of the *McDonnell Douglas* burden-shifting framework. Yet, as is discussed in greater detail below, we affirm the District Court's grant of summary judgment pursuant to the third prong of the *McDonnell Douglas* framework because Skelton has not shown that Defendant's articulated reason for terminating his position was a pretext designed to mask age discrimination.

Although, as noted, we assume that Skelton established a prima facie case of age discrimination, and specifically the *Barnes* additional evidence requirement, we find it appropriate to address briefly the District Court's prima facie analysis. Skelton argues on appeal that, when the evidence is viewed in the light most favorable to him and without consideration of Defendant's self-serving evaluation criteria, the District Court should have determined that he established the fourth element of the prima facie case of age discrimination due to the substantial

12

evidence that Defendant retained less qualified employees than he. *See Barnes*, 896 F.2d at 1466 ("[A] plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff."); *Williams v. Gen. Elec. Co.*, 269 F. Supp. 2d 958, 967 (S.D. Ohio 2003) ("To meet the heightened *prima facie* requirement in a RIF case . . . Plaintiff in this case could present evidence that he was more qualified than the younger workers [the employer] did not terminate.") (citing *Barnes*); *but see Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) ("In a RIF, qualified employees are going to be discharged."). Defendant, however, asserts that after the centralization in 2000, the Planners located in the Spring Grove facility began to be responsible for planning the distribution of all of Defendant's brands from the five mixing centers to Defendant's grocery store customers. Thus, after the centralization, Defendant asserts that Skelton "began performing an essentially new job." (Def.'s Br. at 5.)

After considering this issue, the District Court concluded that Skelton's "assertion that he had better qualifications than the other candidates is not sufficient to establish the fourth prong." (J.A. at 116, Dist. Ct. Op. at 11.) According to the District Court, this is because "the [proper] inquiry is 'whether the other candidates are more qualified *with respect to the criteria that [Defendant] actually employs*.'" (J.A. at 116-17, Dist. Ct. Op. at 11-12 (emphasis added) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000)).) To support this conclusion, the District Court offered the following discussion, quoted below in its entirety.

> [W]ith respect to Plaintiff's allegation that less experienced employees were retained, Defendant, in determining who to retain, did not emphasize experience, knowledge or tenure. Instead, Defendant focused on *the planners who were willing to put forth the greatest amount of time and effort into the position*. The

13

> Transportation Department was in a crisis due to the failure of the reorganization and Defendant needed planners who would work as long as necessary to [make] reorganization a success. In evaluating Plaintiff, it was determined his work habits did not mesh with Defendant's needs. Instead, he "did his eight-hour day and went home". Further, he "did his job. But frankly, that's all he did, was his job. A lot of people were showing themselves to take on a lot more responsibility than just their jobs, which was what was needed." Moreover, the reviewers "didn't see any evidence that [Plaintiff] was working with other people, that he would do more than what the specific request was."

(J.A. at 116, Dist. Ct. Op. at 11 (emphasis added) (citations omitted).) In other words, after considering Defendant's stated criteria to evaluate the Planners, i.e., allegedly desiring "the Planners who were willing to put forth the greatest amount of time and effort into the position," the District Court determined that Skelton's alleged "experience" was not necessarily consistent with Defendant's hiring goals. Thus, according to the District Court, Skelton's substantial experience as a Planner as compared to the retained Planners was insufficient to satisfy the fourth element of the prima facie case. Although the District Court arrived at the correct result--that Skelton's age discrimination claims could not survive summary judgment--it committed an error in its analysis of the "qualifications" issue at the first stage of the *McDonnell Douglas* burden-shifting framework.

In an *en banc* decision in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), this Court instructed that an employer's alleged nondiscriminatory reason for taking an adverse employment action may not be considered by a court when analyzing the prima facie case. *Id.* at 574. That is, a court must sustain clear boundaries when assessing the three stages of the *McDonnell Douglas* burden-shifting analysis. *Peters*, 285 F.3d at 473 ("[T]he legitimate non-discriminatory reason offered by the employer at the second stage of the *McDonnell Douglas*

14

inquiry may not be considered in determining whether the employee has produced sufficient

evidence to establish a prima facie case.") (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d

651, 660 (6th Cir. 2000)).  To do otherwise, Skelton correctly asserts, could "wrongly collapse[]

the final stages of the burden shifting analysis into the evaluation of the plaintiff's *prima facie*

case."  (Pl.'s Br. at 24.)  However, in its assessment of the fourth element of the prima facie case-

-the first stage of the burden-shifting analysis--the District Court improperly viewed Skelton's

asserted superior experience through the prism of Defendant's alleged nondiscriminatory

retainment criteria.  In other words, the second and third stages of the *McDonnell Douglas*

burden-shifting analysis were--but should not have been--addressed by the District Court during

its discussion of the first stage of the burden-shifting analysis.[4]  Thus, the District Court

improperly considered the Defendant's alleged nondiscriminatory reason for taking an adverse

employment action when it analyzed Skelton's prima facie case.

Skelton himself adds to this confusion when he argues that "he was more qualified *by* []

*Sara Lee's own standards* than numerous retained employees" at the time of the RIF.  (Pl.'s Br.

at 16 (emphasis added).)  Thus, Skelton himself contradicts his argument that the District Court

failed to heed *Wexler*.  Moreover, Skelton does not even articulate what exactly he means by

"Sara Lee's own standards," although the most likely meaning of "standards" in this context is

the Defendant's alleged nondiscriminatory reason for taking an adverse employment action, i.e.,

---

[4] Of course, the District Court was free to separately analyze the second and third stages of the *McDonnell Douglas* burden-shifting analysis.  However, to avoid collapsing the final stages of the analysis into the evaluation of the prima facie case, the District Court should only have considered the second and third stages if: (1) it found that Skelton established a prima facie case, or (2) if it discussed the later stages under the aegis of an alternative finding, e.g., "even if Skelton were deemed to have established a prima facie case of discrimination . . . ."  However, the District Court neither made such a finding nor presented such an alternative finding.

15

invoking the second stage of the *McDonnell Douglas* burden-shifting analysis. Thus, this quotation suggests that at the prima facie stage, even Skelton evaluated his qualifications in light of Defendant's standards, or at least his perception of them. However, Skelton's invocation of Defendant's "own standards" does not alter the requirement as discussed in *Wexler* that a purported prima facie case be analyzed without consideration of the employer's alleged nondiscriminatory reason for terminating the position.

Notwithstanding the District Court's error with regard to the first stage of the *McDonnell Douglas* burden-shifting framework, we will affirm the District Court's grant of summary judgment in favor of Defendant. We assume that Skelton has established a prima facie case of age discrimination but, as discussed below, he has not met his burden to show pretext.

### b. Legitimate Nondiscriminatory Reason for Termination

Where an employee establishes a prima facie case of age discrimination--which, as noted above, we assume here for the present purposes--then under the *McDonnell Douglas* framework, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Wexler*, 317 F.3d at 574. Here, Defendant asserts that "it sought to retain Planners who demonstrated a willingness to put in as much time and effort as necessary, and go beyond the traditional job requirements, in order to meet the needs of the business." (Def.'s Br. at 40.) Defendant allegedly was in desperate need of Planners with such characteristics "because the centralization of the transportation department was such a disaster, [and] management was under great pressure to restructure the department in a manner that would address the customer service problems emanating from the department." (*Id.* at 7 (noting further that "the department was in a crisis mode, and the jobs of the managers were at stake in making a second

16

reorganization work").) According to Defendant, Skelton "simply did not demonstrate such characteristics." (*Id.*) Defendant presented deposition testimony from Humphrey and Gibson who both indicated that Skelton was less willing than other Planners to go beyond the basic requirements of the position. Defendant also cites Skelton's last performance appraisal prior to the RIF, in which Gibson recorded that Skelton "does not stretch beyond his day-to-day duties," as he "[t]ends to operate in his own silo of responsibility, unless asked." (Def.'s Br. at 16; J.A. at 232.) Although Defendant's alleged evaluation criteria is not immune from reproach, we find that Defendant has met its burden of production by putting forth a legitimate, non-discriminatory reason for Skelton's termination.

### c. Pretext

Lastly, if an employer is able to articulate some legitimate, nondiscriminatory reason for its actions, the burden shifts back to the employee to rebut the employer's proffered reason by showing by a preponderance of the evidence that the employer's articulated reason was a pretext "designed to mask age discrimination." *Wexler*, 317 F.3d at 574. As the District Court noted, a plaintiff may prove pretext by showing that the employer's proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to motivate the employer's challenged conduct. *Id.* at 576; *see also Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (noting that the first and third "types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed a 'suspicion of mendacity'"). Skelton does not specifically articulate how his alleged evidence demonstrates pretext under any of these types of rebuttals. Nevertheless, it is helpful to address Skelton's

17

argument in the context of these particular showings.

"The first type of rebuttal . . . consists of evidence that the reasons given by the employer simply did not happen." *Peters*, 285 F.3d at 471. Here, although Skelton challenged, as an analytical matter, whether the termination of Planners should be characterized as a RIF, Skelton does not argue that his position was terminated pursuant to Defendant's efforts to decentralize. Skelton also does not contest that Defendant's decision to reduce its workforce was based upon a legitimate business decision. Thus, Defendant's reason for including Skelton in the RIF is clearly based in fact.

Taken out of order, "[t]he third type[] ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* at 471-72 (citation and quotation marks omitted). Skelton spends a good deal of time in his brief discussing how several of the retained Planners were, in his estimation, less qualified than Skelton. However, Skelton does not assert that any of these Planners exhibited an unwillingness to "put in as much time and effort as necessary, and go beyond the traditional job requirements[] in order to meet the needs of the business." (Def.'s Br. at 40.) In other words, Skelton proffers no evidence that the retained Planners were deficient with regard to Defendant's asserted non-discriminatory reason for the employees' termination. Moreover, it is Skelton's burden, not Defendant's, to show that he was superior to a retained employee with regard to Defendant's asserted criteria. Thus, Skelton has not carried his burden to show that Defendant's proffered reason was insufficient to motivate its termination decisions.

Lastly, Skelton can show pretext under the second type of rebuttal by showing that

18

Defendant's proffered reason "did not actually motivate" its decision to terminate Skelton's position. Although he does not denote his arguments as such, Skelton asserts at least three identifiable grounds to establish pretext under this rebuttal type: (1) Defendant utilized inconsistent criteria to select Skelton for termination; (2) Defendant had made its decision to terminate Skelton prior to the interviews; and (3) Defendant did not utilize performance reviews or objective data in the decision-making process. For the following reasons, Skelton has failed to present sufficient evidence that Defendant's asserted justification demonstrates pretext, or that it lacks credibility. *See Reeves*, 530 U.S. at 149 (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated") (emphasis added).

This Court has recognized that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Asmo*, 471 F.3d at 596. In this vein, Skelton argues that despite its claims to the contrary, Defendant actually sought employees who possessed different characteristics than simply willingness to work long hours. For example, Defendant allegedly "sought to retain the best Planners who could best service the customers and those where were the best performers." (Pl.'s Br. at 31.) Defendant, however, consistently argues that it sought to retain those Planners who were willing to work long hours and do more than the basic requirements of the job. Skelton has therefore identified a factual dispute: whether Defendant consistently used the same criteria to determine which Planners to retain. However, this factual dispute is not material. Even if, as a practical matter, Defendant's evaluation criteria were not strictly limited to the stated criteria, it does not mean that the

19

evaluation system that was applied was itself discriminatory. *See Smith*, 195 F. App'x at 396

(noting that "the fact that [an] evaluation system used may not have been the best tool for

evaluating employee performance does not show that the RIF based on evaluations made under

that system was not proper"). For example, Skelton does not argue that Defendant ever

considered age as a relevant factor in its evaluation process of the Planners. As the Supreme

Court articulated in *St. Mary's Honor Center v. Hicks*, "[i]t is not enough . . . to *dis* believe the

employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."

509 U.S. 502, 519 (1993) (emphasis in original). Here, although there may be *some* evidence to

show that Defendant did not rely solely on the criteria that it proffers, Skelton simply has

produced no evidence that Defendant utilized any alternate criteria that implicated intentional age

discrimination.

Skelton next argues that the interviews "were clearly a sham." (Pl.'s Br. at 32.) Skelton

complains about the chronology of Defendant's decision-making process, noting specifically that

the decision to terminate his position had been made prior to the interviews. Even if this Court

assumes that Defendant made the decision to eliminate Skelton prior to the interviews, it does

not necessarily follow, or even suggest, that Defendant targeted Skelton because of his age. *See,

e.g.*, *Hooper v. Cargill, Inc.*, 187 F.3d 635, 1999 WL 552560, at *5 (6th Cir. July 23, 1999) (per

curiam) (table). After all, Skelton had been working as a Planner for Defendant for more than 17

years. It is reasonable to assume that, prior to his actual interview, Defendant was sufficiently

aware of Skelton's professional proclivities to support an informed evaluation of him with regard

to the stated criteria. Thus, even if Skelton could show that prior to his interview Defendant had

decided that he would be terminated, it simply does not bear upon the question of whether

20

Defendant discriminated based on age.

Finally, Skelton asserts that Defendant did not utilize performance reviews or objective data in the decision-making process. For example, Skelton notes that "the interview forms for retained Planners were nearly devoid of notes, whereas the forms for the terminated Planners were fully completed." (Pl.'s Br. at 32.) Apart from the interview forms of Christen Baum and Mike Jones, two Planners who were retained and whose forms were filled with notes, Skelton's assertion is largely true. The interview forms of nearly every dismissed Planner were filled with notes, while the forms of most of the retained Planners had few or no notes. However, even if we assume that Defendant's evaluation process was haphazard--at least as it pertained to note-taking during the interviewing process--there exists no reasonable inference that Defendant discriminated on the basis of age. *See Coleman*, 232 F.3d at 1285 ("That [the employer] made unwise business judgments or that it used a faulty evaluation system does not support the inference that [it] discriminated on the basis of age."); *Peters*, 285 F.3d at 470 ("[M]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.") (citation and quotation marks omitted). For example, Skelton asserts no correlation between interview forms that were filled out and the respective ages of the Planners. In fact, of the Planners who were dismissed and whose interview forms were copiously filled, approximately half of them were under the age of 40. Thus, Defendant's evaluation process may have been imperfect, but it does not suggest that the process was itself discriminatory on the basis of age.[5] For the foregoing reasons, when viewing all the

_____

[5] Although all of the retained Planners were younger than Skelton, the fact remains that the average age of the Planners decreased minimally after the decentralization (from 37.79 prior to the RIF, to 36.84 after the RIF), and three of the retained Planners (Beverly Fitch, 45.15 years

evidence in the light most favorable to Skelton, we find that there exist no genuine issues of material fact.

Accordingly, Skelton has failed to show by a preponderance of the evidence that Defendant's articulated reason was a pretext "designed to mask age discrimination." *Wexler*, 317 F.3d at 574. Therefore, we will affirm the District Court's decision to grant summary judgment in favor of Defendant because Skelton has not satisfied the third stage of the *McDonnell Douglas* burden-shifting framework.

### C.    State Law Claims

The District Court did not address Skelton's state law claims. However, this was not inappropriate. This Court has acknowledged that when "analyzing claims arising under Ohio Rev. Code § 4112, Ohio courts have adopted the framework established in federal case law concerning Title VII and the [ADEA]." *Peters*, 285 F.3d at 469. Thus, Skelton's state law claims rise and fall with his federal claims. For the reasons stated above with regard to Skelton's ADEA claims, his state law claims were properly dismissed.

### III.

Although we base our decision on the third stage of the *McDonnell Douglas* burden-shifting framework, we **AFFIRM** the District Court's grant of summary judgment in favor of Defendant with regard to Skelton's federal and state law claims.

---

old; Marketta Hayes, 44.92; and Christen Baum, 43.24) were within the protected class and not substantially younger than Skelton, age 46.22, when his position was terminated.