**[Cite as *Leach v. Ohio State Univ.*, 2024-Ohio-561.]**

### IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| MONTEE LEACH | Case No. 2022-00305JD |
| Plaintiff | Judge Lisa L. Sadler<br>Magistrate Holly True Shaver |
| v. | <u>DECISION</u> |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

{¶1} On September 22, 2023, Defendant filed a Motion for Summary Judgment, which has been fully briefed and is now before the Court for review. Plaintiff alleges that Defendant discriminated against him on the basis of race[1] and sex when it terminated his probationary employment as a police officer for The Ohio State University Police Department (OSUPD). Plaintiff also brings hostile work environment claims based on race and sex.[2]

{¶2} In its Motion for Summary Judgment, Defendant argues that Plaintiff cannot state a prima facie case of discrimination because he cannot show that another similarly-situated comparable employee was treated more favorably than he was. Furthermore, Defendant asserts that it terminated Plaintiff's probationary employment for a legitimate, nondiscriminatory reason that was not a pretext for discrimination. Defendant also argues that it did not subject Plaintiff to either a racially-based or sexually-based hostile work environment. In response, Plaintiff concedes that he cannot state a prima facie case of discrimination using the indirect method of proof because he has identified no similarly-situated probationary employee who was treated more favorably than he was. But Plaintiff asserts that because Defendant did not analyze the claim using the direct

---

[1] Count 1 of Plaintiff's Amended Complaint is labeled "Sex Discrimination and Hostile Work Environment." However, the substance of Plaintiff's Amended Complaint also includes race discrimination.

[2] Plaintiff's breach of contract claim was previously dismissed by the Court on October 26, 2022.

evidence method, genuine issues of material fact remain for trial. Plaintiff makes no argument in support of his claims of hostile work environment. In its reply, Defendant asserts that the direct evidence that Plaintiff points to in his response does not constitute direct evidence as a matter of law. Defendant's Motion for Summary Judgment is now before the Court for a non-oral hearing pursuant to Civ.R. 56 and L.C.C.R. 4. For the reasons set forth below, Defendant's motion is GRANTED.

**Standard of Review**

{¶3} Civ.R. 56(C) states, in part, as follows:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶4} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). A "movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C)." *Id.* at 292. "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied." *Keaton v. Gordon Biersch Brewery Rest. Group*, 10th Dist. No. 05AP-110, 2006-Ohio-2438, ¶ 15.

{¶5} When a moving party makes a properly supported motion for summary judgment, the adverse party may not rest upon the mere allegations or denials in the

pleadings but "by affidavit or as otherwise provided in [Civ.R. 56] must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party." Civ.R. 56(E). In seeking and opposing summary judgment, parties must rely on admissible evidence and evidentiary material as provided in Civ.R. 56(E). *Keaton* at ¶ 18. The Court must resolve all doubts and construe the evidence in favor of the nonmoving party. *Pilz v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-240, 2004-Ohio-4040, ¶ 8.

**Facts**

{¶6} The parties submitted various depositions, affidavits, and exhibits in support of and in opposition to Defendant's Motion for Summary Judgment. The evidence submitted, viewed in a light most favorable to Plaintiff, shows the following:

{¶7} Plaintiff is a black male. (Amended Complaint, ¶ 2.) Plaintiff began working as a police officer for OSUPD in December 2019. (Leach Depo., 11:24-12:4.) Plaintiff was subject to a probationary period of employment for the duration of his employment with OSUPD. (Leach Depo., 19:24-20-4.) Before being hired by OSUPD, Plaintiff was a trooper for the Ohio State Highway Patrol. (Leach Depo., 10:23-11:17.) Because of his previous training as a state trooper, Plaintiff had reduced training requirements to become a police officer for OSUPD. (Leach Depo., 14:18-15:8.) However, Plaintiff still had to undergo training to obtain his OPOTA certification, which was required by OSUPD. (Leach Depo., 15:5-21.)

{¶8} The first few weeks of Plaintiff's employment consisted of classroom training. (Leach Depo., 18:13-21.) Plaintiff accuses OSUPD Lieutenant Joanna Shaul (Lt. Shaul), a white female, of discriminating against him. (Leach Depo., 28:23-29:6.) Plaintiff asserts that when Lt. Shaul was administering a test to Plaintiff and the three other new officers in his group, she was short and stern with them, yelling at them when it was time for them to put their pens down. (Leach Depo., 43:1-13.) Although she was rude with everyone that day, Plaintiff alleges that Lt. Shaul was generally more arrogant and discourteous when interacting with Plaintiff and the other male recruit than she was with the two female recruits. (Leach Depo., 48:7-49:4; 51:16-19.)

{¶9} After the classroom training, Plaintiff and the other new officers were paired up with experienced officers for field training orientation. (Leach Depo., 17:4-11; 18:13-21.) During one incident, Plaintiff and his field training officer received a call to transport a youth who had been "pink slipped" to a hospital and take him to the children services office because his mother refused to pick him up. (Leach Depo., 58:20-21; 59:3-8.) Plaintiff was required to obtain the youth's information, including his address, for his report. (Leach Depo., 59:3-8.) The youth mumbled his address, and Plaintiff wrote down what he thought was said and then stated the address on the police radio system. (Leach Depo., 59-60.) Plaintiff asserts that at that time, Lt. Shaul got on the main air channel—such that any officer working that day could hear her—and told Plaintiff not to forget to get the youth's apartment number. (Leach Depo., 59:24-60:5.) Plaintiff alleges that Lt. Shaul then switched to a private channel to the experienced officer overseeing Plaintiff's training and said that Plaintiff provided an incorrect address for the youth and stated that providing an inaccurate address could be construed as "lying on a document." (Leach Depo., 60-63.)

{¶10} On a day that Plaintiff was supposed to wear plain clothes instead of his uniform, Plaintiff wore Yeezy sneakers and a Bapesta shirt. (Leach Depo., 53:3-17.) Plaintiff asserts that Lt. Shaul looked at Plaintiff and questioned why he came to work dressed like that and made a facial expression. (Leach Depo., 53:19-23.)

{¶11} In addition to these interactions with Lt. Shaul, during his probationary period of employment, Plaintiff was subjected to an investigation as a result of an alleged instance of domestic violence which was reported to OSUPD by Renee Romero, the mother of Plaintiff's child.

{¶12} Plaintiff was previously in a romantic relationship with Romero. (Leach Depo., 83:7-10.) Plaintiff testified in his deposition that he ended the relationship before Christmas of 2019. (Leach Depo., 83:11-17.) However, when Plaintiff was interviewed for the internal investigation, he stated that he ended the relationship for good after February 28, 2020. (Spears-McNatt Aff., Ex. E, p. 22.) Plaintiff and Romero have a daughter together, born in October 2019. (Leach Depo., 145:7-9.) Although they were no longer romantically involved, Romero continued to live with Plaintiff and their daughter at Plaintiff's residence through at least April 5, 2020. (Leach Depo., 84-86.) Their

relationship was volatile, and Romero physically abused Plaintiff on multiple occasions. (Leach Depo., 84:2-11; 88:21-23, 222:22-223:23.)

{¶13} In the early morning of April 5, 2020, Romero entered Plaintiff's bedroom and woke him up. (Leach Depo., 79-80.) Plaintiff recorded the interaction on his cell phone. (Leach Depo., 80:10-12.) Romero was drunk and demanded that they get back together. (Leach Depo., 80:3-9.) When he refused, Romero said that she would "ruin him" and called the Reynoldsburg police. (Leach Depo., 80:19-81:12.) Romero tried to block Plaintiff from leaving the room, but he managed to get out. (Leach Depo., 81:2-5.)

{¶14} The Reynoldsburg police came and took Romero's and Plaintiff's statements. (Leach Depo., 81:12; Shaul Aff., Ex. J, Reynoldsburg Police Report.) No charges were filed against Romero or Plaintiff. (Shaul Aff., Ex. J, Reynoldsburg Police Report, p. 4.) The police report states that Romero had a very small scratch on her hand, but "[d]ue to the appearance and location of the scratch, it did not appear that the scratch was caused by someone attempting to cause physical harm to Romero." (Shaul Aff., Ex. J, Reynoldsburg Police Report, p. 8.) Plaintiff reported the police contact to OSUPD by texting or calling Chief of Police Kimberly Spears-McNatt before he reported to work that morning. (Leach Depo., 92:17-24.) Romero reported the incident to OSUPD as an instance of domestic violence. (Shaul Aff., Ex. I.)

{¶15} As a result of the incident, OSUPD began an internal affairs investigation into whether Plaintiff violated four provisions of OSUPD General Orders 1.3 and 26.1. (Spears-McNatt Aff., ¶ 4; Spears-McNatt Aff., Ex. E, p. 3.[3]) The investigation was conducted by Lt. Shaul. (Spears-McNatt Aff., ¶ 4.) The investigation uncovered several instances in which Plaintiff damaged property in his own residence, which he owns, out of anger.

{¶16} Sometime after their daughter was born, Romero took their daughter with her to New York. (Spears-McNatt Aff., Ex. E, p. 22.) She then took the baby to Chicago and left her with her grandparents in Chicago while Romero traveled to Mexico. (*Id.*) When they spoke on the phone, Romero asked Plaintiff if they were not together, who

---

[3] The pagination of Defendant's Exhibit E begins on the second page. Page citations refer to the page number at the bottom of each page.

would protect their daughter from being raped. (*Id.*) Plaintiff then punched the wall of his residence out of frustration that he could not do anything. (*Id.*) He also damaged his closet and a door by punching them during the same week while the baby was away. (Spear-McNatt Aff., Ex. E, p. 22-23.) The exact dates of these incidents are unclear, as Romero and Plaintiff provided different dates as part of the investigation. (Spear-McNatt Aff., Ex. E, p. 26.)

{¶17} In October 2019, according to Romero, Plaintiff punched a wall in the hallway of his residence because Romero's friend "texted her about a guy." (Spears-McNatt Aff., Ex. E, p. 7; Ex. E, Photo 4.) According to Plaintiff, he punched the wall because Romero said that another man would become his daughter's stepdad. (Spears-McNatt Aff., Ex. E, p. 23.) The punch made a hole in the drywall. (Spears-McNatt Aff., Ex. E, Photo 4.) According to Romero, that was the last time Plaintiff punched something. (Spears-McNatt Aff., Ex. E, p. 7.) Romero was present in the house with Plaintiff when he punched the hallway wall. (Spears-McNatt Aff., Ex. E, p. 26.) During the investigation, Plaintiff stated that he damaged other property in his home, including a door, a closet, and a hallway, but that these incidents occurred while Romero and his daughter were out of the house. (Spears-McNatt Aff., Ex. E, p. 23.) Plaintiff damaged the property out of frustration with Romero's conduct. (*Id.*) Plaintiff started recording arguments with Romero in December 2019 so that he would not be accused of wrongdoing. (*Id.*) Plaintiff provided recordings from February 28 and April 5, 2020 during the investigation. (*Id.*)

{¶18} It is undisputed that Romero was physically violent towards Plaintiff. (Spear-McNatt Aff., Ex. E, p. 26.) The investigation concluded, however, that there was no reason to believe that Plaintiff had committed domestic violence. (Spears-McNatt Aff., Ex. E, p. 26.) Nevertheless, the internal investigation report, written by Lt. Shaul, states the following:

> However, on multiple occasions and by his own admission, Officer Leach allowed verbal statements to provoke his emotions to the point of losing control. This loss of control resulted in multiple instances of significant property damage. Further, his behavior for the last several months demonstrates an unacceptable lack of judgement and perception. In law enforcement, we cannot control the actions or words of those we encounter.

We must, however, control our own actions and responses to those around us. The facts in this case show Officer Leach has repeatedly been unable or unwilling to control his actions. Ultimately, I conclude that Officer Leach's behavior does not meet the high standards required of an Ohio State University Police Officer.

(Spears-McNatt Aff., Ex. E, p. 26.) Lt. Shaul concluded that Plaintiff violated General Order 1.3 – Private Life, which states:

Division employees will behave in a manner that does not bring discredit to their agencies or themselves. A law enforcement employee's character and conduct while off duty must always be exemplary, thus maintaining a position of respect in the community in which he or she lives and serves. The employee's personal behavior must be beyond reproach.

(Spears-McNatt Aff., Ex. E, p. 27.) Lt. Shaul also concluded that Plaintiff violated General Order 26.1 – Code of Conduct, which requires that officers "[c]onduct their private and professional lives in such a manner as to avoid bringing the police division or The Ohio State University into disrepute." (*Id.*) Lt. Shaul forwarded her report and its attachments up the chain of command. Chief Spears-McNatt agreed with Lt. Shaul's findings and conclusions. (Spears-McNatt Depo., 35:2-4.)

{¶19} Plaintiff began his employment with OSUPD as a probationary officer. (Leach Depo., 20:4.) Employees in their probationary period do not receive the full protections from the contract between Defendant and the union. (Simpson Depo., 22:1-11.) A non-probationary officer can be terminated only for just cause. (Simpson Depo., 22:20-23.) However, a probationary officer's employment can be terminated for any reason that is not illegal. (Simpson Depo., 23:17-19.) Due to the nature of the violations of the General Orders, Chief Spears-McNatt was required to send the report to HR. (Spears-McNatt Depo., 24:6-25:8.)

{¶20} David Simpson, the manager of labor relations within Defendant's human resources department, made the determination to terminate Plaintiff's employment based on the information he received, including the internal affairs investigation that concluded that Plaintiff's off-duty conduct had violated department work rules. (Simpson Depo., 13:9-14:6.) Simpson explained that he generally relies "on the evidence that the

department has presented in their request for probationary removal." (Simpson Depo., 23:22-24:8.)

{¶21} Plaintiff filed a complaint regarding the internal investigation with Defendant's Office of Institutional Equity. (Spears-McNatt Depo., Ex. 1.) The Office of Institutional Equity conducted an investigation. (*Id.*) The investigation concluded that "[n]otwithstanding troubling comments made to Leach that have a general victim-blaming tenor, there is no evidence that Leach's perceived lack of empathy was based on Leach's protected classes and/or that Lt. Shaul would have arrived at a different conclusion if Leach were not Black, not a man, or both. Additionally, Leach asserted that the conduct referenced in the OSUPD IA report does not have a work nexus. However, the General Orders of OSUPD have been similarly applied previously, which fails to suggest that the application herein was based on Leach's protected classes." (Spears-McNatt Depo., Ex. 1, p. 5.)

**Law and Analysis**

**Employment Discrimination**

{¶22} R.C. 4112.02 provides, in pertinent part, that: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race * * * [or] sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment." In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v. Ohio Civil Rights* Comm., 61 Ohio St.3d 607, 609-610 (1991). "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.,* 10th Dist. Franklin No. 11AP-706, 2012-Ohio-1709, ¶ 25, quoting *Ricker v. John Deere Ins.* Co., 133 Ohio App.3d 759, 766 (10th Dist.1998).

{¶23} Although Plaintiff identified a similarly-situated comparable employee in his amended complaint, Officer Brandon Cruz, Plaintiff admits in his Response that he cannot

prove discrimination via the indirect method of proof because Officer Cruz was not a probationary employee. (Response, p. 11.) Accordingly, the Court finds that Plaintiff has abandoned his claims of discrimination via the indirect method of proof, and instead of reciting the familiar *McDonnell Douglas* burden-shifting framework, the Court will analyze this case through the direct method of proof.[4]

{¶24} "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ceglia v. Youngstown State Univ.*, 2015-Ohio-2125, 38 N.E.3d 1222, ¶ 16 (10th Dist.). "If that evidence is credible, 'discriminatory animus may be at least part of an employer's motive, and in the absence of an alternative, non-discriminatory explanation for that evidence, there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court.'" *Id.*, quoting *Norbuta v. Loctite Corp.*, 1 Fed.Appx. 305, 312 (6th Cir.2001). "If a plaintiff can produce direct evidence of a discriminatory animus, '"the burden [of production and persuasion] shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."'" *Ceglia* at ¶ 16, quoting *Skelton v. Sara Lee Corp.*, 249 Fed.Appx. 450, 454 (6th Cir.2007), quoting *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir.2005).

> In determining whether the employer's statements constitute direct evidence of * * * discrimination, the Sixth Circuit cases consider the following four factors: (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Ceglia* at ¶ 17, quoting *Krupnick v. ARCADIS of U.S., Inc.*, S.D.Ohio No. 2:12-CV-273, 2014 U.S. Dist. LEXIS 32700 (March 13, 2024), citing *Skelton* at 455.

---

[4] Plaintiff argues in his Response that Defendant's Motion for Summary Judgment should be denied because Defendant analyzed this case using the indirect, not the direct, method of proof, and solely stated that Plaintiff had presented no direct evidence of discrimination. However, Defendant pointed to a lack of direct evidence of discrimination in its Motion for Summary Judgment. Therefore, Plaintiff's argument on this point is not well-taken.

{¶25} Plaintiff argues that Lt. Shaul and Chief Spears-McNatt (black female) both concluded that Plaintiff had violated OSUPD policies, which ultimately led to his termination, with the public's perception in mind, which led them to be influenced by the public's perception of men as "what an abuser looks like." (Response, p. 7, quoting Shaul Depo., 52:19-20.) In support of his argument, Plaintiff points to comments made by Chief Spears-McNatt that the standards for the police division are specifically for the university, and that OSUPD faces public pressure to satisfy the students and academia. Plaintiff argues:

> Students question law enforcement. ([Spears-McNatt Depo., 32:16-33:12.])
> So the Chief requires investigating officers like Lt. Shaul to consider how
> the student body may perceive an accused officer's actions, given the
> environment of academia. (*Id.* at 32:16-33:12, 35:17-37:2, 38:7-39:1.)

(Response, p. 6.)

{¶26} Upon review of Chief Spears-McNatt's deposition, the actual statements cited by Plaintiff do not contain any direct evidence of discrimination. Chief Spears-McNatt testified about the importance of an officer having the ability to stay calm under pressure. Chief Spears-McNatt did state that OSUPD takes into account how students will perceive an officer's conduct when determining what "conduct unbecoming" is. (Spears-McNatt Depo., 36:6-12.) But her statement is not itself evidence of discriminatory animus based on Plaintiff's race or sex. Plaintiff insinuates that Spears-McNatt's testimony shows that the university takes into account that students will generally perceive a man to be "what an abuser looks like." (Response, p. 6-7, quoting Shaul Depo., 52:19-20.) However, "'[c]omments or remarks that "require a factfinder to draw further inferences to support a finding of discriminatory animus" do not constitute direct evidence.'" *Ceglia* at ¶ 23, quoting *Krupnick*, quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir.2008.) Upon review of Chief Spears-McNatt's actual statements, none of them constitutes direct evidence of discriminatory animus.

{¶27} Plaintiff argues that Lt. Shaul found that he violated OSUPD policies because she took into consideration how the student body might perceive an OSUPD officer who had been accused of domestic violence. Plaintiff argues that Lt. Shaul took into consideration the public's perception that domestic violence abusers are male by "noting

it." (Response, p. 7, quoting Shaul Depo., 52:22-53:2.) Putting her testimony in context, Lt. Shaul stated in her deposition:

> So I don't consider the public perception of domestic violence. I understand that it's a lot more complicated than people think. I think it affects all sorts of people. Like, people may, the public may have a perception of what an abuser looks like. I do not share any such perception. I believe that I have a nuanced, more nuanced, let's say, understanding of the way relationship violence works. And so I don't consider really, other than just noting it, what public perception is of domestic violence abusers.

(Shaul Depo., 52:16-53:2.) Even construing the evidence most strongly in Plaintiff's favor, the only reasonable conclusion is that Lt. Shaul's statement does not constitute direct evidence of discriminatory animus as a matter of law, because it requires a factfinder to draw further inferences to support a finding of discriminatory animus. Nor does it show that Lt. Shaul improperly took the public's perception into account when she conducted the investigation.

{¶28} The Court also finds that the investigation by the Office of Institutional Equity does not constitute direct evidence of discriminatory animus. The investigation report concluded that some of Lt. Shaul's comments were found to have a "general victim-blaming tenor." However, given that the report concluded that the perceived lack of empathy (by Lt. Shaul) was not based on race or sex, several inferences would have to be made to conclude that a general victim-blaming tenor is direct evidence of race or sex discrimination. "Comments or remarks that 'require a factfinder to draw further inferences to support a finding of discriminatory animus' do not constitute direct evidence." *Krupnick*, 2014 U.S. Dist. LEXIS 32700, 8, quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir.2008.) Therefore, the investigation report does not show direct evidence of discriminatory animus.

{¶29} Finally, none of the above-mentioned comments or actions by Lt. Shaul, including her being rude to male officers, correcting Plaintiff over the radio, or criticizing Plaintiff's clothes, constitute direct evidence of discrimination as a matter of law because they also require a factfinder to draw further inferences to support a finding of discriminatory animus.

{¶30} Assuming, arguendo, that Plaintiff had pointed to any direct evidence of discrimination, ""the burden [of production and persuasion] shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."" *Ceglia*, 2015-Ohio-2125, 38 N.E.3d 1222, ¶ 16 quoting *Skelton*, 249 Fed.Appx. at 454, quoting *Minadeo*, 398 F.3d 751 at 763. OSUPD began the investigation regarding plaintiff because it received a citizen complaint from Romero that plaintiff committed domestic violence. Lt. Shaul was assigned to conduct an investigation during which she interviewed both Romero and Plaintiff, visited the residence, and took pictures of the damaged walls and doors. The investigation found that Plaintiff damaged his own property out of frustration, punching holes in the walls and damaging doors. Plaintiff admits that he damaged his own property. Lt. Shaul ultimately concluded that Plaintiff did not commit domestic violence. However, based on Plaintiff's actions, the report concluded that Plaintiff violated OSUPD General Orders and did not have the appropriate temperament to interact with students and members of the public who generally antagonize police officers. Even construing the evidence most strongly in favor of Plaintiff, Defendant has produced sufficient evidence to show that it would have terminated Plaintiff's probationary employment because Plaintiff's own conduct of not controlling his temper under emotional stress did not meet the standards required of an OSUPD police officer. Therefore, even assuming arguendo that Lt. Shaul had an impermissible bias against black men when she conducted her investigation, Plaintiff was subject to probationary removal based upon his own conduct and temperament. The court's job is "not to judge whether an employer made the best or fairest decision, but to determine whether the decision" was based on illegal discrimination. *Mittler v. OhioHealth Corp.*, 10th Dist. Franklin No. 12AP-119, 2013-Ohio-1634, ¶ 52, citing *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 23. The only reasonable conclusion is that Plaintiff's probationary removal was not based upon his race or sex.[5] Therefore, Defendant is entitled to summary judgment as a matter of law on Plaintiff's discrimination claims.

---

[5] The Court notes that although Plaintiff set forth arguments based on sex discrimination, he did not specifically argue race discrimination in his response to Defendant's Motion for Summary Judgment.

**Hostile Work Environment**

{¶31} Defendant also argues that Plaintiff was not subjected to a hostile work environment on the basis of his race or sex.  "To prevail on a claim for hostile work environment created by racial harassment, a plaintiff must demonstrate: (1) the employee is a member of a protected class, (2) the harassment was unwelcome, (3) the harassment was based on race, (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment, and (5) employer liability through respondeat superior." *Hinton v. Ohio Dept. of Youth Services*, 2022-Ohio-4783, 204 N.E.3d 1174, ¶ 33 (10th Dist.), citing *Chapa v. Genpak, LLC*, 10th Dist. Franklin No. 12AP-466, 2014-Ohio-897, ¶ 33.

{¶32} "In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action."  *Hampel v. Food Ingredients Specialists*, 89 Ohio St.3d 169, 2000-Ohio-128, 729 N.E.2d 726, paragraph two of syllabus; *Ballard v. Community Support Network*, 10th Dist. Franklin No. 10AP-104, 2010-Ohio-4742.

{¶33} When determining whether racial harassment created an intimidating, hostile or offensive work environment, a court must consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance."  *Chapa* at ¶ 34; *see also Ballard* at ¶ 10 (applying similar factors to a claim for hostile environment sexual harassment).

{¶34} Defendant argues that none of Lt. Shaul's conduct toward Plaintiff was based on his race or sex.  Defendant further argues that the alleged harassing conduct was not

sufficiently severe or pervasive enough to create a hostile work environment. The Court notes that Plaintiff does make an argument to support his hostile work environment claims in his response to Defendant's motion for summary judgment.

{¶35} The behavior that Plaintiff described in his deposition as creating a hostile work environment as to race or sex includes Lt. Shaul being more rude to Plaintiff and the other male in his recruiting class than she was to female recruits, Lt. Shaul criticizing Plaintiff over the main radio channel for not noting an address correctly, and Lt. Shaul criticizing Plaintiff's clothing on a day that Plaintiff was allowed to wear plain clothes to work. However, Plaintiff does not point to any instances of Lt. Shaul using racist or sexist language. Even construing the evidence most strongly in Plaintiff's favor, the only reasonable conclusion is that Lt. Shaul's conduct was not based on Plaintiff's race or sex. Furthermore, the only reasonable conclusion is that the alleged harassing conduct was not sufficiently severe or pervasive enough to affect the terms, conditions, or privileges of Plaintiff's employment. Therefore, Defendant is entitled to summary judgment as a matter of law on Plaintiff's claims of hostile work environment.

## Conclusion

{¶36} Construing the evidence most strongly in Plaintiff's favor, the Court finds that there are no genuine issues as to any material fact and Defendant is entitled to summary judgment on Plaintiff's claims of discrimination and hostile work environment based on race and sex. Therefore, Defendant's Motion for Summary Judgment is GRANTED.

LISA L. SADLER
Judge

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| MONTEE LEACH<br><br>    Plaintiff<br><br>    v.<br><br>THE OHIO STATE UNIVERSITY<br><br>    Defendant | Case No. 2022-00305JD<br><br>Judge Lisa L. Sadler<br>Magistrate Holly True Shaver<br><br><u>JUDGMENT ENTRY</u> |

{¶37} A non-oral hearing was conducted in this case upon Defendant's Motion for Summary Judgment. For the reasons set forth in the decision filed concurrently herewith, Defendant's Motion for Summary Judgment is GRANTED. Judgment is rendered in favor of Defendant. All previously scheduled events are VACATED. Court costs are assessed against Plaintiff. The Clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

LISA L. SADLER
Judge

**Filed January 10, 2024**
**Sent to S.C. Reporter 2/15/24**